1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  MITCHELL ENGINEERING,                    No. C 08-04022 SI

9          Plaintiff,                       **ORDER DENYING PLAINTIFF'S
                                            MOTION FOR SUMMARY JUDGMENT
10      v.                                  and GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'
11  CITY AND COUNTY OF SAN FRANCISCO,       MOTIONS FOR SUMMARY JUDGMENT**
    et al.,
12
           Defendants.
13  _____/

14

15         The Court heard oral argument on the cross-motions for summary judgment filed by plaintiff

16  Mitchell Engineering, defendant City and County of San Francisco, and defendant Anthony Irons on

17  June 25, 2010.  Having considered the arguments of the parties and the papers submitted, and for good

18  cause shown, the Court hereby DENIES plaintiff's motion and GRANTS in part and DENIES in part

19  defendants' motions.

20

21                              **BACKGROUND**

22         This litigation arises from a business dispute between plaintiff Mitchell Engineering, defendant

23  City and County of San Francisco ("the City"), including the City's Department of Power and Water

24  ("DPW") and Public Utilities Commission ("PUC"), and defendant Anthony Irons, the Deputy General

25  Manager of the PUC.[1]  Plaintiff is a public works contractor who previously entered into many

26  municipal construction contracts with the City for projects such as upgrading the City's utility pipelines,

27      _____

28      [1] Plaintiff's claims against Michael Quon, Director of the PUC's Construction Management Bureau, and Alan Wong, PUC's Safety Manager, have been dismissed with prejudice subject to certain conditions not relevant to the resolution of these summary judgment motions.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   drinking water reservoirs, and bridges.

2          This dispute arose after Mitchell Engineering, primarily through Curt Mitchell, its president,

3   began speaking to the media in 2005 about what it believed to be the City's mishandling of a project

4   involving the seismic retrofitting and rehabilitation of the Fourth Street Bridge. Plaintiff's conversations

5   with reporters resulted in several news articles, including a May 31, 2006 article in *San Francisco*

6   *Weekly* entitled "A Bridge Too Costly" and a July 31, 2006 article in the *San Francisco Chronicle*

7   entitled "4th Street Bridge is Up a Creek."[2]  *See* Betz Decl. Ex. B.  Both articles recounted statements

8   by plaintiff's president to the effect that the City's mismanagement and errors had resulted in significant

9   delays and cost increases to the Fourth Street Bridge project.  Mitchell was also quoted as stating that

10  the City was refusing to pay for the increased construction costs that had resulted from its own

11  negligence.  *Id.*  Plaintiff alleges that, after it spoke out to the media, the City retaliated against it by

12  taking a number of actions designed to drive plaintiff out of business.  The primary actions complained

13  of concern the City's termination of plaintiff from its work on the Fourth Street Bridge project and

14  withholding of funds on other projects.  Plaintiff alleges that these adverse actions were carried out in

15  retaliation for plaintiff's speech and in order to ensure that plaintiff could not qualify to bid on future

16  construction projects.

17         Plaintiff brought six breach-of-contract suits in state court between July 2007 and February 2008,

18  each of which challenged the City's actions in connection with a particular construction contract.

19  Plaintiff filed this action in federal court in August 2008, alleging that the City's conduct amounted to

20  civil conspiracy, tortious interference with contractual relations and prospective economic advantage,

21  and civil rights violations under 42 U.S.C. § 1983.  By order dated March 9, 2010, the Court dismissed

22  the tort claims with prejudice.  Plaintiff's remaining civil rights claims allege that the City and Irons

23  violated plaintiff's rights to procedural and substantive due process and its rights under the First

24  Amendment by terminating plaintiff from the Fourth Street Bridge contract and assessing liquidated

25  damages in other contracts, thereby essentially freezing plaintiff out of future contracts with the City.

26         Presently before the Court are the parties' cross-motions for summary judgment.

27  ─────────────────

28         [2] The City's relevance objection to the latter article is overruled.

2

**United States District Court**
For the Northern District of California

**LEGAL STANDARD**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Plaintiff's cause of action under 42 U.S.C. § 1983 can be divided into three claims. First, plaintiff alleges that the City violated its right to procedural due process by failing to provide procedural safeguards prior to carrying out a constructive debarment which rendered plaintiff unable to obtain future public works contracts. Second, plaintiff alleges that this constructive debarment violated its

right to substantive due process by depriving it of its liberty interest in pursuing the occupation of its choice.  Finally, plaintiff alleges that the City violated its right to free speech by retaliating against it for publicly speaking out against the City.

## I.       City's Liability under *Monell*

As an initial matter, the City asserts that it is entitled to summary judgment on all of plaintiff's claims because it cannot properly be held liable under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).  A plaintiff who seeks to state a claim under 42 U.S.C. § 1983 against a municipality may not sue on the basis of *respondeat superior* liability, but must sue under *Monell* by alleging that he or she has suffered a constitutional violation as a result of a municipal policy, custom, or practice.  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).  Ordinarily, to succeed in proving a *Monell* claim, a plaintiff must show that the municipality expressly adopted an unconstitutional policy or that the constitutional violation was the result of a "longstanding practice or custom."  *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (citation omitted).  However, evidence of an isolated violation may suffice where "the person causing the violation has 'final policymaking authority'" or where a "final policymaker 'ratified' a subordinate's actions" and the unlawful basis for those actions.  *Id.* at 1235, 1238-39 (citations omitted).

It is undisputed that, pursuant to the San Francisco City Charter, PUC General Manager Susan Leal has final policymaking authority with respect to PUC actions.  *See* S.F. City Charter § 8B.121(d) (Docket No. 139) (General Manager has authority to "adopt rules and regulations governing all matters with the jurisdiction of" the commission).  The City asserts that plaintiff has presented no evidence that Leal played any part in taking the adverse actions at issue in this case.  Plaintiff has shown, however, that one of the primary adverse actions at issue in this case – the decision to terminate plaintiff from the Central Pump Station Project – was made by defendant Irons acting in concert with Leal.  *See* Irons Depo., Betz. Oppo. Decl. Ex. EE, at 74:14-18, 75:2-7 (Docket No. 149) (stating that the decision to terminate plaintiff from the Central Pump project was "made in concert with myself and the general manager of the PUC, Susan Leal" and that "the final decision . . . to write the termination letter" was "approved by Ms. Leal").  This evidence is, at the very least, sufficient to create a material issue of fact

4

regarding whether Leal ratified plaintiff's termination.  *See Lytle v. Carl*, 382 F.3d 978, 988 (9th Cir. 2004) (ratification shown where final policymaker "actively participated in . . . and ratified the decisions of his subordinates" and subordinate "specifically testified at trial that he collaborated with" the final policymaker).

Plaintiff has also presented sufficient evidence to create a factual dispute as to whether Leal ratified the *basis* for the termination – in other words, that Leal was aware of and approved plaintiff's termination for the purpose of freezing plaintiff out of future City contracts and/or retaliating against plaintiff for speaking out against the City.  *Christie*, 176 F.3d at 1239.  First, plaintiff has shown that the decision to terminate plaintiff was reached as a result of numerous meetings between Irons and Leal, raising an inference that Irons and Leal discussed the basis for the termination.  *See* Irons Depo. at 74:23-75:1.  Additionally, plaintiff has shown that the termination was initiated after plaintiff appeared before PUC officials to discuss its complaints regarding the City's actions.  *See* Johanson Depo., Betz Oppo. Decl. Ex. D, at 50-52.  Although defendants deny any connection between plaintiff's appearance before the PUC and the termination, the Court agrees with plaintiff that this sequence of events, if proved at trial, could permit the jury to conclude that Leal and/or the PUC ratified the retaliatory basis for plaintiff's termination.

## II.    Procedural Due Process Claim

Plaintiff's procedural due process claim centers around its allegation that the City constructively debarred plaintiff from future eligibility for public works contracts without providing notice and a hearing.  The facts underlying this claim are as follows.  Plaintiff entered its last successful bid for a City contract in March 2004.  Fine Decl. ¶ 3 (Docket No. 134).  In approximately October 2006, the City implemented a new set of pre-qualification requirements for contractors wishing to submit bids for certain projects.  *See* Request for Qualifications, Betz. Decl. Ex. T, at 3 (Docket No. 129).  Among other things, the new requirements provided that a contractor could not pre-qualify to bid on future projects if it had been terminated from a project in the past eight years or had paid more than $50,000 in liquidated damages in three consecutive prior projects in the past five years.  *Id.* at 15-16.

In January 2007, the City terminated plaintiff from its contract for the Central Pump Station

United States District Court
For the Northern District of California

Project.  Johanson Decl. ¶ 10;[3] Jan. 2, 2007 Letter, Johanson Decl. Ex. 8 (Docket No. 136).  Thereafter, the City also contacted another municipality, the City of Hayward ("COH"), to suggest that it impose liquidated damages against plaintiff.  *See* Mar. 15, 2007 Email from Johanson to Irons, Betz Decl. Ex. K ("Dennis [Tsai, PUC's Manager] also suggested that the COH should assess LDs [liquidated damages] and contact the bonding company."); Mar. 20, 2007 Letter from PUC to COH, Betz Decl. Ex. M, at 3 (describing PUC's prior suggestion to assess liquidated damages in the "hope that by informing you about Mitchell, you would take steps to avoid the problems we had with them," and recounting COH's response that it "instead decided to assist Mitchell in completing the work in a 'reasonable amount of time'" and did not wish to "allow unrelated issues or disputes between Mitchell and SFPUC to interfere with [its] decisions on this project").  Plaintiff argues that this sequence of events amounts to constructive debarment in that the City's actions were designed to ensure that plaintiff could not pre-qualify to bid on future construction projects with the City.

### A.    Futility of Applying to Bid

The City argues that plaintiff's procedural due process claim must fail because plaintiff never actually applied to pre-qualify or attempted to submit any bids after the City took the adverse actions against it.  The City states that the pre-qualification process would itself have provided plaintiff with all the process it was due, including the opportunity to appeal an adverse determination.  The City's argument amounts to a renewal of the ripeness challenge it raised in moving to dismiss the procedural due process claim from plaintiff's First Amended Complaint.  At that time, the City's argument was successful because plaintiff's First Amended Complaint simply alleged constructive debarment in a conclusory manner, without any specific allegations concerning the pre-qualification requirements or the City's intentions with respect to plaintiff's ability to meet those requirements.  *See* Feb. 23, 2009 Order at *5-6 (Docket No. 30).

Plaintiff's theory at present, however, is that the City's actions were carried out in order to ensure that plaintiff would fail the pre-qualification requirements, meaning that any attempt by plaintiff

---

[3] Plaintiff's objections to this paragraph are overruled.

1  to apply to pre-qualify would have been futile.  Plaintiff argues that, under these circumstances, it was

2  not required to bid or to attempt to pre-qualify before bringing this action.  Plaintiff's theory finds

3  support in the case law.  *See Beekwilder v. United States*, 55 Fed Cl. 54, 61 (Fed. Cl. 2002) ("If

4  submitting an application, or taking a step in an administrative process would serve no purpose then its

5  avoidance will not defeat ripeness."); *CNA Corp. v. United States*, 81 Fed. Cl. 722, 727 (Fed. Cl. 2008)

6  (plaintiff not required to submit bid for federal health study contract before bringing suit to challenge

7  rejection of the bid where rejection would have been "all but certain").[4]

8          In order to avail itself of the futility exception, however, plaintiff must prove or at least raise a

9  material dispute of fact concerning whether the City's adverse actions were carried out with the purpose

10 of preventing plaintiff from meeting the pre-qualification requirements.  In the Court's view, plaintiff

11 has made a sufficient factual showing.  First, plaintiff has raised a dispute of fact as to the validity of

12 the City's stated reasons for terminating plaintiff from the Central Pump project.  According to

13 defendant Irons, a primary reason for plaintiff's termination was its inability to complete the project on

14 time.  Irons testified at his deposition that a likely cause of the delay was financial trouble that rendered

15 plaintiff unable to pay its employees and subcontractors:

16         [T]here was a significant financial problem, because there were no workers on this
           Central pump station for a long period of time.  Nobody was there.  Nobody was getting
17         paid.  There was stop notices that couldn't be cured or weren't being cured.  And so I
           think my assumption was they did not have the financial . . . resources necessary to
18         finish the project.  They simply didn't have them.

19 Irons Depo., Betz Decl. Ex. I, at 168:3-11; *see also id.* at 169:10-15 (it was a "consensus among the

20 entire project team" which reported to Irons that "we d[id]n't believe Mitchell ha[d] the financial

21 capacity to finish the project").  As plaintiff points out, however, Irons was aware several months prior

22 to plaintiff's termination that the City had failed to make certain payments due to plaintiff on other

23 projects.  *Id.* at 186:20-187:1; Oct. 13, 2006 Email to Irons, Betz. Decl. Ex. H (describing erroneously

24 withheld payment).  Irons did not know as of the date of his deposition in February 2010 whether

25

26         [4] The plaintiff in *CNA Corp.* had previously submitted two proposals that were rejected, and
   argued that a third application would have been futile.  Although plaintiff in this case has admittedly
27 never applied to pre-qualify, the Court finds *CNA Corp.* persuasive.  The Court notes in particular that
   PUC officials have admitted that the effect of the termination and other adverse actions against plaintiff
28 is that plaintiff would certainly fail the pre-qualification requirements.

United States District Court
For the Northern District of California

plaintiff had ever been provided with this missed payment.  Irons Depo. at 188:8-9.  This evidence, while slim, raises an issue of fact as to whether the City purported to use plaintiff's lack of capital in order to terminate it from the Central Pump project despite knowing that some of plaintiff's financial trouble stemmed from the City's own actions.

Second, plaintiff has presented evidence that, at a meeting concerning the City's projects with plaintiff, City employees were instructed, "if we don't collect LDs or default [terminate] them we won't be able to catch them in the prequal."  Fine Notes, Betz Decl. Ex. U; Fine Depo., Betz Decl. Ex. S, at 135:4-17 (stating that notes were from "a meeting I was in regarding various Mitchell projects").[5]  In its briefing and at oral argument, the City vigorously disputed plaintiff's contention that this statement constitutes evidence of any ill intent on the part of the City.  The Court agrees that plaintiff's evidence at this stage is not strong.  However, given the subjective nature of the termination decision and the fact that resolution of the reasons underlying the termination may depend largely on credibility determinations, the Court believes that it must be left to the jury to decide whether plaintiff can prove that the City was targeting plaintiff as a result of its media statements, as opposed to acting out of a legitimate concern regarding plaintiff's performance.

**B.    Exclusion from All City Contracts**

The City also argues, albeit briefly, that plaintiff cannot show de facto debarment as a matter of law because the pre-qualification requirements only applied to certain City contracts and therefore plaintiff was not prevented from entering into *all* City contracts.  As an initial matter, deposition testimony of the City's own employees contradicts the City's assertion.  Fine Depo. at 123:18-23 ("Tony Irons was clear to me that his intention was to have a prequalification program for all PUC construction projects.").  Moreover, even assuming that there were some contracts not subject to the pre-qualification requirements, plaintiff has presented uncontroverted evidence that prior terminations would prevent it from obtaining surety bonds necessary to bid for all public works contracts.  *See* Expert Surety

---

[5] Defendants object to this evidence on the ground it is misleading.  In the Court's view, however, Ms. Fine's testimony and notes pertain to the City's intentions regarding plaintiff's future ability to contract with the City, one of the key factual disputes in this case.  Therefore, the evidence is appropriate for consideration on summary judgment.

Underwriting Report (hereinafter "Surety Report"), Betz. Oppo. Decl. Ex. W, at 2 ("A termination notice immediately red flags the account as high risk, meaning the contractor will virtually be precluded from obtaining surety bonds.  Without bonds, a contractor cannot win future public works contracts."). Therefore, even if the pre-qualification requirements did not apply to all City contracts, plaintiff has raised an issue of fact as to whether it was effectively prevented from qualifying for any future City work.  Both parties' motions for summary judgment as to the procedural due process claim are DENIED.

### III.     Substantive Due Process Claim

Plaintiff also states a substantive due process claim based on its alleged de facto debarment. Plaintiff claims that the City's actions deprived it of its liberty interest in pursuing the occupation of its choice.  Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that interferes with rights implicit in the concept of ordered liberty." *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007) (quotation marks, alteration and citation omitted).  The Ninth Circuit has specifically "recognized the liberty interest in pursuing an occupation of one's choice." *Id.* at 997.

Defendants argue that plaintiff cannot make out a substantive due process claim because plaintiff cannot show that it was entirely foreclosed from working as a contractor, as opposed to, at most, being shut out from obtaining future public works contracts with the City.  Defendants' position finds support in Ninth Circuit and Supreme Court case law, both of which hold that the deprivation of a plaintiff's ability to practice its profession must be absolute in order to be actionable as a substantive due process violation. *See Conn v. Gabbert*, 586 U.S. 286, 292 (1999) (cases recognizing a substantive due process right in one's profession "all deal with a complete prohibition of the right to engage in a calling"); *Engquist*, 478 F.3d at 997 (recognizing claim based on government's alleged "interference with [plaintiff's] ability to pursue a profession altogether").

In its papers, plaintiff made no effort to distinguish these cases and in fact acknowledged that the substantive right to engage in a profession can be encroached by a government employer's actions only in "extreme cases, such as a government blacklist [that] . . .effectively excludes the blacklisted

9

individual from his occupation." *Id.* at 997 (quotation marks and citation omitted).  Applying the standard set forth by the Supreme Court and the Ninth Circuit, the Court must conclude that plaintiff has not presented evidence sufficient to show or even raise a material factual dispute as to whether defendants' actions have rendered it unable to obtain any new employment.  Plaintiff's evidence is wholly directed at proving that it is unable to obtain future contracts with the City of San Francisco. Plaintiff has put forth no evidence showing that, as a result of defendants' actions, it is unable to obtain any other type of contract, such as contracts with private employers.

Plaintiff stated in its papers that it is "exclusively engaged in public contracts" and that its inability to obtain work with the City effectively spells an end to its business.  Plaintiff further asserted at oral argument that public works projects are a specialty within the contracting field, much like the specialty of cardiology within the field of medicine, and that its inability to obtain public works contracts will effectively spell an end to its ability to work as a contractor.  Plaintiff's argument is insufficient to defeat summary judgment on this claim.  First, plaintiff has made no evidentiary showing to support its assertion that public contracting work is sufficiently specialized that exclusion from such work may constitute a substantive due process violation.  Second, plaintiff's own assertions establish that it engages solely in public contracting work by choice.  Ninth Circuit authority holds that where a plaintiff is unable to obtain new work through reasons unrelated to the defendant's actions, there is no substantive due process violation.  *See Engquist*, 478 F.3d at 999 ("[I]t appears that [plaintiff] works in a highly specialized field, and there simply are not many jobs available in that field in Oregon.  Because Defendants did not cause this situation, their specific actions have not made it 'virtually impossible' for [plaintiff] to find new employment.").  Defendants are not responsible for plaintiff's choice to work solely on public contracts.  Plaintiff has not shown that harm to its reputation will prevent it from obtaining private contracts, or that it is somehow unqualified or ineligible for private contracts.  Plaintiff has shown no more than that it will suffer reduced business as a result of its own choice to engage in public contracting work.

Accordingly, plaintiff's motion for summary judgment as to its substantive due process claim is DENIED, and the City's and Irons's cross-motions are GRANTED.

**United States District Court**
For the Northern District of California

**IV.    First Amendment Claim**

Plaintiff's final claim is that the City and Irons violated plaintiff's rights under the First Amendment by taking the adverse actions described throughout this order in retaliation for plaintiff's protected speech.  A contractor asserting a First Amendment retaliation claim against government officials must prove that: "(1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004).  If the contractor meets its burden of proving these three elements, the defendants may avoid liability by proving either that "legitimate administrative interests . . . outweigh the contractor's free speech interests" or that they "would have taken the same actions in the absence of the contractor's expressive conduct." *Id.*

First, the Court finds that at least some of plaintiff's speech – namely, its comments to reporters regarding the City's alleged mishandling of a major municipal construction project funded by taxpayer dollars – addressed a matter of public concern.  *See Johnson v. Multnomah County, Or.*, 48 F.3d 420, 425 (9th Cir. 1995) ("[M]isuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern.").  Defendants do not dispute this by anything more than a few conclusory sentences.  Second, in light of the foregoing discussion regarding plaintiff's procedural due process claim, the Court must also conclude that plaintiff has presented evidence sufficient to defeat summary judgment regarding the elements of adverse action and the fact that plaintiff's speech was a motivating factor behind that action.  Defendants asserted both in their papers and at oral argument that plaintiff cannot show that its termination was motivated by its speech, given that plaintiff had disputes with the PUC prior to plaintiff's speech acts.  Defendants argued at the hearing that permitting a First Amendment retaliation claim under these circumstances would essentially enable contractors to insulate themselves against termination by simply speaking out to the media after getting into a dispute with the City.  The Court recognizes that the City has a significant interest in being able to run its public works projects, including terminating contractors with performance problems, without encountering constitutional challenges where its actions are taken for legitimate reasons.  However, just as a contractor should not be able to protect itself from termination

simply by speaking out against the City, neither should the City be able to insulate itself from liability for First Amendment retaliation simply by pointing out that it had a preexisting dispute with the contractor bringing the claim. The Court believes that, in this case, it is fundamentally a question for the jury whether plaintiff's speech caused the parties' differences to escalate beyond mere contractual disputes to First Amendment retaliation. Plaintiff has presented sufficient evidence at this stage to be permitted to test its theory before a jury.[6]

The Court must now determine whether the City and Irons have met their burden of showing either that legitimate governmental interests outweighed plaintiff's free speech interest or that they would have terminated plaintiff from the Central Pump project and taken the other adverse actions at issue even if plaintiff had not spoken out against the City. *Alpha Energy Savers*, 381 F.3d at 923. Irons asserts in his motion that he is entitled to summary judgment because plaintiff has not shown that he had any personal involvement in any First Amendment retaliation. However, as the Court has already concluded, there is no dispute that Irons was involved in making the decision to terminate plaintiff from the Central Pump project. Material disputes of fact and significant credibility questions prevent the Court from determining at this time whether Irons and the PUC would have taken this adverse decision even absent plaintiff's speech.

Additionally, the City spends a significant portion of its summary judgment motion arguing that it did not retaliate against plaintiff in connection with each of the six contracts that are at issue in the lawsuits currently pending in state court. Plaintiff's claims in this case, however, are based on its termination from the Central Pump project and certain other specific financial actions taken by the City after plaintiff spoke out in 2006. The majority of the actions discussed in the City's motion took place prior to plaintiff's speech, and are therefore not relevant to plaintiff's claims. The City has presented no other persuasive reason that it is entitled to summary judgment on plaintiff's First Amendment

---

[6] The City has also argued that it actually withdrew its notice of termination after some of plaintiff's public speech acts in late 2006, and only reinstated the termination in January 2007. The City asserts that this course of events demonstrates good faith and undermines any contention of First Amendment retaliation. At oral argument, plaintiff countered that the City wanted to wait until 2007 to effectuate the termination because the pre-qualification requirements were set to take effect on January 1, 2007. The City did not dispute this assertion. The dispute concerning the import of the timing of events presents another factual dispute weighing against the granting of summary judgment to any party.

1    claims.  As with defendant Irons, the Court believes that material factual and credibility disputes

2    preclude summary judgment as to the City's liability.

3    The parties' motions for summary judgment regarding the First Amendment claim are DENIED.

4

5    **V.    Qualified Immunity**

6    Defendant Irons argues very briefly in his reply in support of his motion for summary judgment

7    and in his opposition to plaintiff's motion for summary judgment that he is entitled to qualified

8    immunity for any alleged violations of plaintiff's constitutional rights.  "Qualified immunity protects

9    government officials from liability for civil damages insofar as their conduct does not violate clearly

10   established statutory or constitutional rights of which a reasonable person would have known." *Tibbetts*

11   *v. Kulongoski*, 567 F.3d 529, 535 (9th Cir. 2009).  To determine whether an official is entitled to

12   qualified immunity, the Court must consider whether the facts, viewed in the light most favorable to

13   plaintiff, establish a violation of a constitutional right, and, if so, whether that right was clearly

14   established at the time of the alleged violation.  *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009);

15   *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).  "To reject a defense of qualified immunity, [the

16   court] must find that the contours of the right are sufficiently clear that a reasonable official would

17   understand that what he is doing violates the right." *Inouye*, 504 F.3d at 712 (quotation marks, alteration

18   and citation omitted).

19   Having concluded that Irons is entitled to summary judgment on the merits of plaintiff's

20   substantive due process claim, the Court need not assess whether qualified immunity might apply to that

21   claim.  With respect to the procedural due process and First Amendment retaliation claims, it is

22   essentially uncontested that terminating a contractor without adequate process and in retaliation for

23   protected speech violates the Fourteenth and First Amendments, respectively.  Irons contends, however,

24   that plaintiff's right not to be terminated was not "clearly established" because it would not have been

25   apparent to a reasonable official that it was unlawful to terminate a contractor with whom the City had

26   a preexisting, performance-related dispute.  Defendants' framing of Irons' actions highlights the factual

27   disputes that prevent a grant of summary judgment on grounds of qualified immunity.  Because the

28   resolution of this question is tied closely to the factual disputes identified above regarding the purpose

13

and intent behind Irons's actions, Ions' request for summary judgment on the basis of qualified immunity must be DENIED.

## VI.    Statute of Limitations

At the very conclusion of its summary judgment motion, the City vaguely argues that any claims arising more than two years before the filing of plaintiff's complaint must be dismissed on statute of limitations grounds. *See Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004) (two-year statute of limitations applies to § 1983 actions brought in California after January 1, 2003). The City clarifies in its reply brief that it is simply seeking "an order that Mitchell may not seek liability or damages for actions that took place *before* August 22, 2006" – two years before the complaint was filed – because "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." City's Reply at 14 (quoting *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 (9th Cir. 2002) (citation omitted). Plaintiff states in its opposition brief that it does not intend to seek liability or damages for actions occurring outside the limitations period, but may wish to introduce evidence of such actions at trial for background purposes. Accordingly, the Court GRANTS the City's motion for a ruling that plaintiff may not seek to impose liability or damages for any acts prior to August 22, 2006, but expresses no opinion at this time regarding the admissibility of evidence of such prior acts.

## CONCLUSION

For the foregoing reasons, and for good cause shown, plaintiff's motion for summary judgment is DENIED and defendants' motions for summary judgment are GRANTED in part and DENIED in part. (Docket Nos. 126, 130, 131).

**IT IS SO ORDERED.**

Dated: July 19, 2010

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California