IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MITCHELL ENGINEERING,

    Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO,

    Defendant.

No. C 08-04022 SI

**ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

On January 28, 2011, the Court heard argument on defendant City and County of San Francisco's renewed motion for judgment as a matter of law. Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES defendant's motion.

**BACKGROUND**

This litigation arises from a business dispute between plaintiff Mitchell Engineering, defendant City and County of San Francisco ("the City" or "defendant"), including the City's Department of Power and Water ("DPW") and Public Utilities Commission ("PUC"), and Anthony Irons, the Deputy General Manager of the PUC.[1] Plaintiff is a public works contractor who previously entered into many municipal construction contracts with the City for projects such as upgrading the City's utility pipelines, drinking water reservoirs, and bridges.

This dispute arose after plaintiff began speaking to the media in 2005 about what it believed to

---

[1] Plaintiff's claims against Michael Quon, Director of the PUC's Construction Management Bureau, and Alan Wong, PUC's Safety Manager, were dismissed with prejudice subject to certain conditions not relevant to the resolution of this renewed motion for judgment as a matter of law.

be the City's mishandling of a project involving the seismic retrofitting and rehabilitation of the Fourth Street Bridge. Plaintiff's conversations with reporters resulted in several news articles, including a May 31, 2006 article in *San Francisco Weekly* entitled "A Bridge Too Costly" and a July 31, 2006 article in the *San Francisco Chronicle* entitled "4th Street Bridge is Up a Creek." Both articles recounted statements by plaintiff's president to the effect that the City's mismanagement and errors had resulted in significant delays and cost increases to the Fourth Street Bridge project. Mitchell was also quoted as stating that the City was refusing to pay for the increased construction costs that had resulted from its own negligence. Plaintiff alleged that, after it spoke out to the media, the City retaliated against it by taking a number of actions designed to drive plaintiff out of business.

By the time of trial, the primary incident that plaintiff complained of concerned the City's termination of plaintiff from its work on the Central Pump project in January 2007.[2] Plaintiff alleged that this termination was carried out (1) in retaliation for plaintiff's speech, in violation the First Amendment, and (2) in order to ensure that plaintiff could not qualify to bid on future construction projects, in violation of the Fourteenth Amendment right to procedural due process.

Plaintiff's procedural due process theory was that the City terminated its Central Pump contract in order to prevent plaintiff from being able to bid on other PUC contracts. In 2006, the PUC designed a prequalification program that included a set of requirements for contractors wishing to prequalify to submit bids for certain projects. Among other things, the new requirements provided that a contractor could not prequalify to bid on those future projects if it had been terminated from a project in the past eight years. TR 890:9–890:19; 893:4–893:14. In support of its claim that the Central Pump termination was intended to debar plaintiff, plaintiff pointed to two main things. The first was a handwritten note taken at a meeting regarding the Central Pump project, which stated "Central Pump. GW, if we don't collect LDs or default them, we won't be able to catch them in the prequal." *See* Pl. Ex. 302; TR

---

[2] Plaintiff brought six breach-of-contract suits in state court between July 2007 and February 2008, each of which challenged the City's actions in connection with a particular construction contract. Plaintiff then filed this action in federal court in August 2008, alleging that the City's conduct amounted to civil conspiracy, tortious interference with contractual relations and prospective economic advantage, and civil rights violations under 42 U.S.C. § 1983. By order dated March 9, 2010, the Court dismissed the tort claims with prejudice. On July 19, 2010, the Court granted summary judgment in favor of the City and Irons on plaintiff's substantive due process claim.

2

895:14–895:21; 896:10–896:11. The second was evidence that the PUC specifically arranged for plaintiff to be terminated after the new prequalification program went into effect. Not only was plaintiff terminated on January 2, 2007, the day after the prequalification program went into effect, but the PUC had retracted a previous termination that had occurred less than one month earlier. TR 340:1–340:15; 342:12–343:12; 347:20–347:23; 888:22–888:24.

A jury trial was held between September 9, 2010 and September 30, 2010. At the close of evidence, the Court granted Irons judgment as a matter of law on plaintiff's procedural due process claim, explaining that Irons was entitled to qualified immunity because the specific contours of plaintiff's liberty interest were not clear at the time the Central Pump contract was terminated. The jury returned a special verdict form that found the City and Irons not liable on plaintiff's First Amendment claim. But the jury found the City liable on plaintiff's procedural due process claim and awarded plaintiff $3.605 million.

Currently before the Court is defendant's renewed motion for judgment as a matter of law.

## LEGAL STANDARD

**I.  Renewed Motion for Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 10 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. Pro. 50(b). The party moving for judgment as a matter of law bears a heavy burden. Granting a renewed motion for judgment as a matter of law is proper when the evidence construed in the light most favorable to the non-moving party permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's verdict. *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 181 (9th Cir. 1989).

The question in a motion for judgment as a matter of law is whether there is substantial evidence

to support the jury finding for the non-moving party. *See Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 909 (9th Cir. 1978). In ruling on such a motion, the trial court may not weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists to support the verdict. *See Mosesian v. Peat, Marwick, Mitchell*, 727 F.2d 873, 877 (9th Cir. 1984). Substantial evidence is more than a "mere scintilla." *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Chisholm Bris. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974). Rather, it is defined as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

## II.     Remittance

The Ninth Circuit has held that a jury's finding on the amount of damages should be reversed only if the amount is "grossly excessive or monstrous," *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003), or if the amount is "clearly unsupported by the evidence" or "shocking to the conscience," *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988). In making this determination, the Court must focus on evidence of the qualitative harm suffered by plaintiff.

## DISCUSSION

## I.     Propriety of the motion

Plaintiff first challenges the propriety of defendant's motion, arguing that it is in effect an impermissible motion for reconsideration of prior rulings of the Court.

Rule 50 of the Federal Rules of Civil Procedure provides that

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

4

Fed. R. Civ. P. 50(a)(1). It goes on to allow "[a] motion for judgment as a matter of law [to] be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2).

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law.

*Id.* 50(b).

Defendant's motion is based on the facts as adduced at trial. Defendant moved the Court for judgment as a matter of law on September 28, after the close of evidence. The Court entered judgement on October 4, 2010, and defendant renewed its motion for judgment as a matter of law twenty-eight days later, on November 1, 2010, raising the same issues that it had raised in its initial motions. The motion before the Court is a properly filed renewed motion for judgment as a matter of law.

**II.     The due process claim and debarment**

Defendant's first argument is that it is entitled to judgment as a matter of law on plaintiff's procedural due process claim. "A Section 1982 claim based upon procedural due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). In this case, the Court instructed the jury that plaintiff "has a protected liberty interest in participating in the process for bidding on public contracts." Doc. 340 ("Instructions to Jury").[3] In order to prove that it was deprived of this liberty interest, the Court instructed, plaintiff was required to prove that it "was formally or automatically excluded from bidding on future contracts with the San Francisco Public Utilities Commission." Defendant argues that this was error because (1) plaintiff had not bid on any San Francisco city projects since 2005 and (2) plaintiff was not prevented from bidding

---

[3] Courts have indicated that the existence of a protected liberty interest is a question of constitutional law for the Court. *See Harper v. Young*, 64 F.3d 563, 566 (10th Cir. 1995). Whether that is always or only sometimes so, both parties here agree that the question of the existence of a protected liberty interest was a question of the Court. *See* Doc. 296 at 112, 118 (proposed jury instructions).

5

on every single City or every single PUC project.[4]

### A.     Liberty interest and plaintiff's history of contract bidding

Plaintiff's procedural due process claim centered around its allegation that defendant intentionally made plaintiff ineligible to bid on future public works contracts without providing notice and a hearing. Debarment from eligibility to bid on public contracts implicates a liberty interest protected by the Due Process Clause. *Golden Day Sch., Inc. v. State Dep't of Educ.*, 83 Cal. App. 4th 695, 706–08 (2000) (calling *Gonzalez v. Freeman*, 334 F.2d 570 (D.C. Cir. 1964), "the leading case for the proposition that debarment implicates a due process interest"). To succeed, the plaintiff must demonstrate a "systematic effort by the procuring agency to reject all of the bidder's contract bids." *Stapp Towing, Inc. v. United States*, 34 Fed. Cl. 300, 312 (1995).

Defendant argues that a company that is not actively bidding on work with a public entity does not have a liberty interest in doing business with that public entity. Because plaintiff had not bid on a City contract since 2005, TR 471:10–472:4; 543:22–543:24, and because the debarment took place in 2007, defendant argues that plaintiff did not have a liberty interest in being eligible to bid on public contracts.

"Many . . . cases conclude that government debarment of a contractor, at least one that has an established record of doing business with the government, implicates a liberty interest." *Golden Day*, 83 Cal. App. 4th at 707 (citing *Taylor v. Resolution Trust Corp.* 56 F.3d 1497, 1506 (D.C. Cir. 1995); *Kartseva v. Dep't of State,* 37 F.3d 1524, 1527 (D.C. Cir. 1994); *Girard v. Klopfenstein*, 930 F.2d 738, 743 (9th Cir. 1991); *Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318 (6th Cir. 1981)). *But see Guzman v. Shewry*, 552 F.3d 941, 954 n. 10 (9th Cir. 2009) (stating that the Ninth Circuit has not yet incorporated this line of cases into its jurisprudence). Defendant itself acknowledges that "[o]ne who has been dealing with the government on an ongoing basis may not be blacklisted, whether by suspension or debarment," without being afforded due process. *See Transco*, 639 F.2d at 321. This is because "[i]nterruption of an existing relationship between the government and a contractor places the

---

[4] Defendant also argues that plaintiff did not have a property interest in the Central Pump project contract that was actually terminated, and both plaintiff and the Court agree.

6

latter in a different posture from one initially seeking government contracts and can carry with it grave economic consequences." *Gonzales*, 334 F.2d at 574.[5]

Here, plaintiff undoubtedly has established not merely a record of doing business with the government, but an ongoing record through and until it was terminated on January 2, 2007, the event that constituted the debarment. When the business formed, its earliest contracts were for public works projects with defendant. TR 225:22–226:7. Between 2000 and 2004, plaintiff contracted with defendant close to 30 time for projects that consisted of work on tunnels, water systems, pipelines, reservoirs, and light rail. TR 228:2–228:13; 228:16–228:21; 229:15–23. There can be no question but that the contractual relationship between the parties existed at least until the point that defendant terminated the Central Pump contract on January 2, 2007. Mr. Mitchell, the founder of Mitchell Engineering, also testified that plaintiff had intended to bid in the future on dozens of specific projects. TR 221:8–221:9; 239:8–239:10.

Moreover, in finding a due process violation, the jury found "that defendant acted with the specific intent of debarring plaintiff from the bidding process for public contracts," and that defendant would not have taken the actions it did if it "had not actually intended to debar the plaintiff." Doc. 340

---

[5] Thus,

> [t]he consequences of administrative termination of all right to bid or contract, colloquially called 'blacklisting' and formally called suspension or debarment, will vary, depending upon multiple factors: the size and prominence of the contractor; the ratio of his government business to non-government business; the length of his contractual relationship with government; his dependence on that business; his ability to secure other business as a substitute for government business. These are some of the basic factors involved. The impact of debarment on a contractor may be a sudden contraction of bank credit, adverse impact on market price of shares of listed stock, if any, and critical uneasiness of creditors generally, to say nothing of 'loss of face' in the business community. These consequences are in addition to the loss of specific profits from the business denied as a result of debarment. We need not resort to a colorful term such as 'stigma' to characterize the consequences of such governmental action, for labels may blur the issues. But we strain no concept of judicial notice to acknowledge these basic facts of economic life.
>   Thus to say that there is no 'right' to government contracts does not resolve the question of justiciability. Of course there is no such right; but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts. An allegation of facts which reveal an absence of legal authority or basic fairness in the method of imposing debarment presents a justiciable controversy in our view.

*Id.* at 574–75 (footnote omitted).

7

at 11–12. That is to say, the jury concluded that even *defendant* believed that plaintiff's decision not to bid on any contracts with the City during that short time period was no indication that plaintiff would not attempt to bid on future contracts with the City.[6]

Plaintiff's failure to bid on contracts with defendant for less than two years before the Central Pump termination is certainly evidence that relates to the relationship between plaintiff and defendant. But other evidence adduced at trial overwhelmingly supports the Court's conclusion that plaintiff had "an established"—and ongoing—"record of doing business with the government." *See Golden Day*, 83 Cal. App. 4th at 707. Thus, "debarment . . . implicate[d] a liberty interest." *Id.* The Court did not err when it instructed the jury that plaintiff had established the first element of a due process violation.

**B. The scope of the debarment**

Defendant argues that plaintiff's due process claim fails because plaintiff was required to show that the termination effectively prevented it from pursuing its occupation, which means that plaintiff needed to show that it was disqualified from all San Francisco contracts, or at the very least from all PUC contracts. Defendant argues that the Court's instructions to the jury permitted it to find a due process violation if defendant's actions precluded plaintiff from bidding on even a single PUC contract, and further that plaintiff was not unconstitutionally debarred as a matter of law.[7]

---

[6] Earlier in this litigation, defendant argued that plaintiff's procedural due process claim must fail because plaintiff never actually applied to prequalify or attempted to submit any bids after the City took the adverse actions against it. Plaintiff's theory, however, was that defendant's actions were carried out in order to ensure that plaintiff would fail the pre-qualification requirements, meaning that any attempt by plaintiff to apply to pre-qualify would have been futile. The Court found support for this futility argument in the case law and permitted plaintiff to proceed on the theory. *See* Doc. 30 at 5–6; *see also Beekwilder v. United States*, 55 Fed Cl. 54, 61 (2002) ("If submitting an application, or taking a step in an administrative process would serve no purpose then its avoidance will not defeat ripeness."); *CNA Corp. v. United States*, 81 Fed. Cl. 722, 727 (2008) (plaintiff not required to submit bid for federal health study contract before bringing suit to challenge rejection of the bid where rejection would have been "all but certain"). The Court explained that in order to rely on this futility exception, plaintiff would also need to present evidence defendant acted with the purpose of preventing plaintiff from meeting the pre-qualification requirements. *See* Doc. 30 at 5–6. The Court instructed the jury accordingly, doc. 340 at 11–12, and defendant does not renew this argument, def. reply at 4.

[7] Defendant states that "to establish a liberty interest," plaintiff was required to "show that the termination effectively prevented it from pursuing its occupation." Motion at 11. However, defendant's argument, ultimately, appears to be that plaintiff was required to prove certain things in order to establish *deprivation* of a liberty interest (the second element of the constitutional claim) rather

8

Defendant's argument conflates two different categories of due process claims. As the *Golden Day* court explained:

> In *Taylor*, the court concluded, based on Supreme Court cases through *Siegert* [*v. Gilley*, 500 U.S. 226 (1991)] , that there are two ways in which government action may result in a change of status sufficient to implicate a liberty interest. One is by action that formally or automatically excludes the plaintiff from work on a category of future public contracts or government employment opportunities. The other is by action that precludes the plaintiff from so broad a spectrum of opportunities that it interferes with the right to follow a chosen profession or trade. *Contract debarment satisfies the first of these categories.*

*Golden Day*, 83 Cal. App. 4th at 707 (emphasis added) (citing *Taylor*, 56 F.3d at 1506); *see also Kartseva*, 56 F.3d at 1506. *Taylor*'s differentiation between "government action" that is "sufficiently formal" and action that is "sufficiently broad" makes sense. *See* 56 F.3d at 1506. Where the action leads to a formal exclusion from a category of contracts, that necessarily involves a certain breadth of exclusion. Moreover, there is more likely a specific event that triggered the debarment, and therefore a specific time where the government was on notice to afford the plaintiff due process before acting. In contrast, where action is informal, the natural inference is that incidents of exclusion are more "isolated . . . 'occurrence[s].'" *See id.* at 1507. It makes sense to expect the plaintiff to prove otherwise. Additionally, the question of when and how the government should have afforded process due to plaintiff is significantly more complicated the more informal the government action. Thus it makes sense to require a plaintiff to make a broader showing of informal exclusion, so that it is clear that the government should have provided formal procedural protections.

Although the Ninth Circuit has not set out the exact contours of this due process right, many other courts have explained how broadly debarment must reach. Some courts have looked objectively at the results of the debarment, holding that the debarment is unconstitutional if it is "sufficiently formal" and from "a category of future public contracts." *Taylor*, 56 F.3d at 1506; *Golden Day*, 83 Cal. App. 4th at 707. Others have focused more on the intent of the government actor, stating that plaintiff must demonstrate a "systematic effort by the procuring agency to reject all of the bidder's contract bids." *Stapp Towing*, 34 Fed. Cl. at 312. Others have used less formal language such as "blacklisted." *Transco*, 639 F.2d at 321.

---

than to establish a liberty interest (the first element of the constitutional claim).

9

In fashioning jury instructions for this claim, the Court incorporated both the subjective and the objective elements discussed by other courts. The Court first stated that "Plaintiff alleges that it was deprived of procedural due process because its termination from the Central Pump project amounted to 'de facto' or constructive debarment from (that is, being shut out of) the process for bidding on public contracts with the San Francisco Public Utilities Commission." Doc. 340 at 11. The Court went on to explain that "[d]e facto or constructive debarment happens when a public employee or entity acts deliberately, with the specific intent to ensure that a particular company cannot participate in the bidding process for the public entity's contracts, and in fact prevents the company from participating in the bidding process." *Id.* Finally, the Court instructed that

> To establish the second element in this case, plaintiff must prove by a preponderance of the evidence that defendant acted with the specific intent of debarring plaintiff from the bidding process for public contracts, and in fact debarred plaintiff. Plaintiff may demonstrate that defendant acted with the specific intent to debar plaintiff if it proves that debarring plaintiff from the bidding process for public contracts was a substantial or motivating factor for terminating plaintiff on the Central Pump project. To prove that defendant in fact debarred plaintiff, plaintiff must prove that plaintiff was formally or automatically excluded from bidding on future contracts with the San Francisco Public Utilities Commission.

*Id.*[8]

It is quite clear from these instructions, taken together, that plaintiff was required to prove that defendant specifically intended to, and did actually, bar plaintiff from bidding on PUC contracts.[9] This was the correct legal standard.

Moreover, the evidence adduced at trial supports the jury's verdict. As discussed at the beginning of this order, the PUC's prequalification program went into effect on January 1, 2007. TR 888:22–888:24. Among other things, the new requirements provided that a contractor could not prequalify to bid on those future projects if it had been terminated from a project in the past eight years or had paid more than $50,000 in liquidated damages in three prior projects in the past five years. TR

---

[8] Moreover, the special verdict form required that the jury find that defendant ratified Anthony Irons' "specific intent of debarring Mitchell Engineering from the bidding process for public contracts." Doc. 342 at 3.

[9] Defendant's argument that plaintiff could have succeeded by proving that "it was shut out of 'any' contract," motion at 11, requires a tortured reading of these otherwise straightforward instructions.

10

890:9–890:19; 893:4–893:14.

Around that time, defendant was also engaged in a "Water System Improvement Project" ("WSIP"). TR 236:14. The project was "[e]ssentially a renovation of the Hetch Hetchy water system for reliability, seismic reliability, redundancy, things of that nature." TR 236:16–18. The Hetch Hetchy water system was built in the 1920s, and it brings water from a watershed near Yosemite National Park to San Francisco. It includes "a series of tunnels and pipelines," as well as "a series of reservoirs," and it "generate[s] power along the way." Ultimately, it "Comes across the bay, around San Jose, across the bay itself, at Dumbarton and up to Crystal Springs, into those reservoirs and gets transmitted into the city for distribution." TR 237:4–237:21.

The Hetch Hetchy infrastructure was in need of repair, and a "bond measure passed to improve Hetch Hetchy's water system"—dedicating money specifically for the WSIP. TR 236:21–25. "[T]he WSIP program had 80 projects" worth "about $3 billion." TR 239:8; 1901:23–1901:24. Mr. Mitchell testified that he expected that plaintiff would have received a large portion of these contracts, because it "had the expertise . . . had worked on it for years and . . . [t]he water system is a very unique system as far as engineering goes." TR 239:14–239:16.

Plaintiff's theory was, essentially, that defendant did not want plaintiff to obtain future contracts and determined that it could prevent plaintiff from bidding by making him unable to prequalify to bid. One piece of crucial evidence to prove this was a handwritten note that Ivy Fine took at a meeting regarding the Central Pump project. Ms. Fine was director of the City's contracts department at the time, and the note she wrote, which was admitted into evidence without objection, stated: "Central Pump. GW, if we don't collect LDs or default them, we won't be able to catch them in the prequal." *See* Pl. Ex. 302; TR 895:14–895:21; 896:10–896:11. Ms. Fine explained that "GW" stood for George Wong, an attorney for the City and County of San Francisco who dealt with construction projects. TR 896:12–896:23. A logical conclusion is that "collect LDs" means assess liquidated damages and "default them" means terminate the "Central Pump" contract—the two things that would impair plaintiff's ability to "prequal" for projects.

Another crucial factor in plaintiff's argument was evidence that the PUC specifically designed the termination to happen the day after the prequalification program went into effect. Plaintiff received

11

1 a letter in October 2006 that stated "This letter serves as a notice to Mitchell Engineering that should
2 Mitchell fail to achieve final completion of the project by December 8, 2006, the contract shall be
3 deemed terminated for cause." TR 340:1–340:15. Plaintiff received another letter on December 8th,
4 2006 that stated "This letter serves as a notice to Mitchell Engineering the City and County rescinds the
5 December 8 termination for cause by the City." TR 342:12–343:12. Then, on January 2, 2007, less than
6 a month later, and just one day after the prequalification program went into effect, plaintiff was
7 terminated from the Central Pump project for cause. TR 347:20–347:23; 888:22–888:24.[10]

It was uncontested that, as a result of the Central Pump termination, plaintiff could not prequalify to bid on PUC contracts. The jury also heard testimony that indicated that *all* PUC contracts were potentially eligible for the prequalification program, and that determining which PUC contracts to make part of the prequalification program was in the sole discretion of defendant. And it heard testimony from which it could reasonably conclude that the more lucrative the project, the more likely it was that bidders would be required to prequalify. TR 927:16–927:21.[11]

The only evidence that plaintiff was able to bid on any PUC contracts was also presented through the testimony of Ms. Fine. Ms. Fine stated that 70 or 80 contracts worth a total of $130 or $140 million were awarded outside of the prequalification program, all told, in the four years since the program was implemented. TR 927:22-928:19.

This small amount of evidence is insufficient to entitle defendant to judgment as a matter of law. First, Ms. Fine did not testify as to how many of the contracts involved the type of work performed by plaintiff. In contrast, Ms. Fine did testify that the Hetch Hetchy / WSIP projects involved the type of work plaintiff performed. TR 932:16–932:18. Second, the contracts were quite small, worth an average of $2 million each. In contrast, Mr. Mitchell testified that the earliest projects that plaintiff undertook

---

[10] Defendant argues that the actual date of the termination is immaterial, because the prequalification program precludes any contractor that was terminated in the prior eight years. A reasonable jury, however, could infer from the evidence of a retraction and then reinstatement of termination the very day after the program went into effect, that the City wanted to *guarantee* that it could "catch them in the prequal" and that no technicality would get in the City's way.

[11] "It's really up to the individual department and the project manager, whether or not they want the project to be subject to the prequalification program. They may look at the value of the project. They may look at the complexity of the project, the scope of services that are going to be requested. Those types of factors." TR 927:16–927:21.

12

when it was founded in 1998 were "smaller projects" worth roughly $8 to $10 million each; later light rail projects undertaken closer in time to the termination were worth $20, $30, and $40 million dollars each. TR 211:5–211:7; 225:22–226:5; 232:9–12. The jury also heard evidence that many of the Hetch Hetchy / WSIP contracts, potentially worth billions of dollars, and funded by a bond measure that dedicated these tremendous resources at a time of major governmental budget cuts in the State of California, were PUC projects subject to the prequalification requirements. TR 236:21–236:25; 886:24–886:25; 932:16–932:18; 1901:23– 1901:24.[12]

The jury's verdict was supported by substantial evidence. Testimony from an employee of defendant that, at its sole discretion, defendant had chosen not to use the prequalification process for certain small contracts for unidentified projects, is not sufficient to entitle defendant to judgment as a matter of law.

### III. Evidence of damages

After finding defendant liable to plaintiff for a due process violation, the jury awarded plaintiff $3.605 million. Defendant argues that this entire award should be remitted, because the record contains insufficient evidence to support the figure.[13] In particular, defendant argues that plaintiff's damages expert, Terry Lloyd, "submitted highly improper and prejudicial damages analysis to the jury," which was insufficient itself to support the award, and which "forced" defendant's damages expert, Wesley Nutten, "to respond with a more accurate but also legally flawed alternative calculation." Reply at 13. Defendant asserts that the "uncontradicted admissible evidence is that Mitchell Engineering was already worth nothing before the Central [Pump] termination and suffered no resulting loss in business value, as properly measured under the law." *Id.*

---

[12] Moreover, the jury could have inferred, based on PUC's actions formally preventing plaintiff from bidding on such a large portion of PUC contracts, and based on the evidence that the PUC specifically intended to bar plaintiff from being allowed to bid on those contracts, that the PUC would not seriously have considered any bid that plaintiff might have made on these small projects.

[13] Earlier in this litigation, defendant argued that the only available remedy for violation of plaintiff's due process rights is the tardy provision of due process. Defendant does not renew that argument.

United States District Court
For the Northern District of California

Mr. Nutten, defendant's damages expert, provided two alternate damage analyses. In his second analysis, he concluded that plaintiff would be entitled to $3.605 million if it could prove that its constitutional rights were violated. Mr. Nutten testified as follows:

> Q. [D]id you perform a parallel alternative damages analysis to Mr. Lloyd?
>
> A. Yes, I did.
>
> Q. And is that damage analysis that you prepared as an alternative to Mr. Lloyd's based on the assumption that Mitchell does prove a constitutional violation by defendants?
>
> A. Yes.
>
> \*\*\*
>
> Q. There were two components of your alternative damages analysis?
>
> A. Yes, they were two components to my alternative damages analysis. I assumed the company should have embarked on an orderly decline in its -- its business in order to gain control of its financial operations. And I measured potential lost profits over the 2006 through 2009 time period based on this orderly decline. And then I also measured the potential difference in the value of the business had it followed that strategy versus the strategy it actually followed.
>
> \*\*\*
>
> Q. And the bottom line number represents the potential lost profits that you estimated assuming that Mitchell does prove a constitutional violation?
>
> A. Right. I applied a -- on those lost revenues, I applied a percent profit margin to those lost revenues. That's based on, to some extent, the company's historical profit margin when they were doing better, as well as, to some extent, the projected profit margin, which the company was hoping to achieve 2 ½ percent. So I made that assumption that 3 percent was reasonable based on that information. And if you apply a 3 percent profit margin to these potential lost revenue numbers, you end up with about $2.4 million of potential lost sales.
>
> \*\*\*
>
> Q. Was there another component of your alternative damages analysis, Mr. Nutten?
>
> A. Yes.
>
> Q. And what was that component?
>
> A. A loss -- portable loss of business value, which is tied to this, but conceptually, if the company had achieved these higher levels of revenues and profits over the '06 to 2009 time period, the company would be worth a small amount more in 2010 than it actually is worth. So this, the lost profits piece of it, feeds into a loss of value piece of damages as well.
>
> \*\*\*

A. . . . Based on the performance projected in this orderly contraction of the business, I have applied the same valuation methods that I used and described earlier to come up with an estimate of value had the company contracted on an orderly basis of about almost $14.9 million. That's the first number that's been highlighted. And that's the but-for value of the company, assuming it contracted on this orderly basis. The actual value of the company is then compared to that but-for value of the company, and the actual value of the company is about $13.7 million at this same point in time, indicating that had the company been able to contract on an orderly basis, it would be worth approximately 1.2, the last number on the page, $1.2 million more than it presently is worth.

Q. Okay.

THE COURT: What time frame does this cover?

THE WITNESS: This is measured as of the beginning of 2010. So it's a forward-looking valuation as of 2010.

BY MS. JOHNSON:
Q. And can you explain to the jury why you did both the lost profits component and a loss of business value component?

A. Because it's important to try and capture all of the potential damages, assuming some sort of liability. And the best way, in my opinion, to do that in a situation like this is to look at, on a discrete basis, the potential difference in but-for and actual performance during the past period for Mitchell and then at a particular point in time, which is now or beginning of 2010, essentially, to look at the value of the company on a forward-looking basis, which is what this represents, and determine what the differential in value is.

\*\*\*

Q. Did you take your lost profits number and add it to your loss of business value number?

A. I did on this schedule, and it's $3.6 million.

Q. And that represents the maximum amount of damages that in your professional opinion the defendants could be liable for if Mitchell does prove a constitutional violation?

MR. MOORE: Objection. Misstates his testimony. He said that was his calculation.

THE COURT: Overruled.
You can answer the question.

THE WITNESS: That is accurate, yes.

BY MS. JOHNSON:
Q. Okay. So the total amount?

A. The total amount is $3.6 million. 3,605,000, to be exact.

\*\*\*

Q. Mr. Nutten, in preparing your alternative damages analysis, did you rely on the projections in Mitchell Engineering's 2004 to 2009 business plan?

A. No, I did not.

Q. Can you explain to the jury why you did not rely on projections in Mitchell Engineering's 2004 to 2009 business plan.

A. I spent significant time looking at those financial projections in the business plan and don't find them to be reliable or reasonable and can't be used as a basis for damages.

Q. Do you believe that your alternative damages analysis is superior to Mr. Lloyd's analysis assuming Mitchell does prove a constitutional violation?

A. Absolutely. I think that the financial projections, my damage figures are based on are supportable, reliable, and consistent with the facts of the case.

TR 1879:11–19, 1884:22–1885:6; 1886:23–1887:10; 1887:15–24; 1888:18–1889:22, and 1891:1–15; 1892:2–18.

The Court finds that the damages award is supported by the evidence. Mr. Nutten testified clearly and without reservation on direct examination that defendants could be liable for $3.605 million in combined lost business value and lost profits if plaintiff were to prove a constitutional violation. This is a figure that is, in Mr. Nutten's own words, "supportable, reliable, and consistent with the facts of the case." TR 1892:17–18. Defendant requested—and received—a jury instruction that damages could be based on loss of business value and loss of profit. Doc. 296 Ex. 1 at 162–64; Doc. 340 at 14.[14] The jury returned just such a measure of damages.

Defendant argues that the damages award was improper nonetheless because, if one were to

---

[14] In instructing the jury on how to determine damages, the Court stated in part:
The plaintiff has the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant. In determining the amount of damages, you should consider the following:
The nature and extent of the injuries;
The difference between the fair market value of any damaged property immediately before the occurrence and its fair market value immediately thereafter;
The value of lost profits Mitchell proved it is reasonably certain it would have earned but for defendants' conduct. To decide the amount of damages for lost profits, you must determine the gross amount Mitchell would have received but for defendants' conduct and then subtract from that the amount of expenses, including the value of labor, materials, rents, interest, and other expenses Mitchell would have had it defendants' conduct had not occurred.
It is for you to determine what damages, if any, have been proved.
Doc. 340 at 14. This language was proposed by defendant. Doc. 296 Ex. 1 at 162–64.

discount Mr. Nutten's conclusion that the figure is "supportable, reliable, and consistent with the facts of the case," and look at Mr. Nutten's testimony about how he arrived at that figure, one would realize that what Mr. Nutten called lost business value was really something different from what the courts call lost business value, and was in fact an *improper* measure of damages. In making this argument, defendant focuses on the word "immediately" in the jury instruction that defendant requested (and received) that informed the jury that it could consider "[t]he difference between the fair market value of any damaged property immediately before the occurrence and its fair market value immediately thereafter."

This instruction was taken verbatim from Ninth Circuit Model Civil Jury Instruction 5.2. Defendant understands this instruction to mean that a jury must look to a single moment in time before which a business is worth a certain amount of money and after which a business is worth a certain amount of money. In some cases, for example where property is physically destroyed by fire, that could be true. Here, however, the constitutional violation was not a single-moment occurrence, but rather a violation that continued from the moment that plaintiff was debarred until the moment that he was provided with a remedy. Thus, the fact that Mr. Nutten's alternate figure accounted for losses incurred over several years is not a reason to remit the damages award.[15] Mr. Nutten's $3.605 million estimate was not legally flawed and is supported by the evidence.

The remainder of defendant's arguments go to undermine the testimony of Mr. Lloyd, plaintiff's damages expert. Defendant seems to argue that the Court erred by permitting Mr. Lloyd to testify, and that this error was so prejudicial that the Court should remit the entire damages award, because the error forced defendant to ask Mr. Nutten to present a counter-figure that defendant would not otherwise have elicited.

"Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755 (2000) (citing 1 J. Weinstein & M.

---

[15] Moreover, approximately $2.4 million of Mr. Nutten's alternate figure was based on his estimate of lost profits, not lost property value. Defendant neither acknowledges this nor challenges it in its motion. More importantly, defendant admitted that this was a proper measure of damages in its proposed jury instructions. *See* Doc. 296 Ex. 1 at 162–64 (the jury should consider "[t]he value of lost profits Mitchell proved it is reasonably certain it would have earned but for defendants' conduct").

17

Berger, Weinstein's Federal Evidence § 103.14, at 103–30 (2d ed. 2000)). According to that logic, the Supreme Court has concluded "that a [criminal] defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error." *Id.* at 760. Here, defendant attempts to go one step further than did the defendant in *Ohler*. Defendant not only suggests that the Court's decision to admit the testimony of Mr. Lloyd was in error, but that the damages award must be reversed because defendant made the decision to introduce *distinct* evidence from a *different* witness on the basis of that error. Defendant made a strategic decision not only to attack the testimony of plaintiff's damages expert, but also to present its own alternate estimation of damages that was greater than zero. It is possible that this decision led the jury to award more compensation that it otherwise would have, and it is possible that this decision led the jury to award less. Either way, the damages award is supported by the evidence that defendant introduced, and the Court will not remit.[16]

///

---

[16] Defendant also challenges that admissibility of Mr. Lloyd's testimony in order to show that Mr. Lloyd's testimony does not constitute sufficient evidence to support the damages award. Because the Court has determined that Mr. Nutten's testimony itself was sufficient to support the damages award, the Court need not reach this argument. In any event, although defendant called Mr. Lloyd's testimony "junk science" at the hearing, defendant's expert did not agree with that characterization. As Mr. Nutten testified on cross examination:

Q. [T]he methodology that you used . . . that is same methodology that Mr. Lloyd uses, right?

A. Essentially yes.

Q. And you don't criticize his methodology?

A. No. It's a widely accepted methodology for valuing a business.

TR 1915:25–1916:7.

# CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's renewed motion for judgment as a matter of law.  (Doc. 371.)

**IT IS SO ORDERED.**

Dated: February 14, 2011

SUSAN ILLSTON
United States District Judge